## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| vs. | ) | |
| | ) | |
| Christian Robert Webb, | ) | Case No. 4:10-cr-046 |
| | ) | |
| Defendant. | ) | |

---

I.      **BACKGROUND**

On June 8, 2010, the defendant, Christian Robert Webb, was charged in a two-count indictment with the crimes of receipt of materials involving the sexual exploitation of minors and possession of materials involving the sexual exploitation of minors, in violation of 18 U.S.C. §§ 2252(a)(2), 2252(a)(4)(B), 2252(b)(1), and 2252(b)(2). See Docket No. 12. On November 23, 2010, a plea agreement was filed and Webb agreed to voluntarily plead guilty to the receipt charge in count one of the indictment. See Docket No. 28. In the plea agreement, the parties agreed that the base offense level for the defendant's conduct is 22 under U.S.S.G. § 2G2.2(a)(2). The parties also agreed to upward adjustments for materials involving a prepubescent minor; for materials portraying sadistic, masochistic, or violent conduct; for the use of a computer; and for the possession of more than 600 images. Id. On February 17, 2011, a change of plea hearing was held in Bismarck, North Dakota. The Court accepted a plea of guilty to count one of the indictment and ordered that a Presentence Investigation Report be prepared by U.S. Probation and Pretrial Services.

The Presentence Investigation Report (PSR) revealed the following <u>undisputed</u> facts, all of which are adopted by the Court and incorporated by reference in this memorandum:

1)      In January 2010, Immigration and Customs Enforcement (ICE) agents in Minot, North Dakota, received information from the Australian Federal Police Child Protection Operations regarding the distribution of child pornography by an Australian citizen.  The Australian citizen communicated with individuals throughout the world, including the United States.  One of the persons identified as having contact with the Australian citizen was identified as Christian Webb, residing at 214 19th Street NW in Minot, North Dakota, with his wife and nine year old daughter. ICE agents then opened a collateral investigation on Webb.

2)      On May 25, 2010, ICE agents were made aware of chat logs utilizing the Yahoo username "nd_biboy," had communicated with subjects in Australia with the username "sydney_bi_couple_m50f42."   The subjects in Australia were later arrested for suspected distribution of child pornography.  The chat logs are approximately three pages in length and appeared to discuss the live sexual abuse of the couple's minor child.

3)      The IP address used by Webb was found to be financed by and belonged to the Minot Public School system.  The superintendent of the school district was contacted and investigators learned that the IP address was assigned to Webb for his use as a teacher and as the school's IT administrator.  It was discovered that Webb had also been issued numerous computers and other digital storage devices for use within his residence in order to maintain the Public School systems computer network.  School authorities issued a verbal and written consent to search any and all devices belonging to the Minot Public Schools.

4)      Because the chat log revealed that children were possibly being sexually abused live via webcam, ICE agents approached Webb at the Minot Public School located at 215 2nd Street SE, Minot, North Dakota, on May 27, 2010, and requested an interview.  During the interview, Webb initially indicated that investigators may find "around 10 to 15 images of child pornography" on the computer assigned to him by the school.  As the interview progressed, Webb admitted that agents would likely find approximately 100 images of child pornography.

5)      ICE agents asked Webb for consent to search the computers and other devices located in his possession and at his home.  Webb consented to the search and accompanied the agents, and other law enforcement officials, to his residence in Minot, North Dakota, where the computers and other devices were located.  The agents located numerous computers, hard-drives, and external hard-drives throughout the home.  North Dakota Bureau of Criminal Investigation Special Agent Tim Erickson, a trained and experienced computer forensic examiner, conducted a quick search of several of the devices located in Webb's residence.  This field preview was conducted using equipment and software designed to allow for confirmation of material depicting the sexual abuse of children.

6)      During the field preview, Agent Erickson identified two (2) images depicting the sexual abuse of prepubescent children on a SMART brand 80 gigabyte hard-drive located during the search.  These images were of a prepubescent male child with his legs spread and the focus of the photo on his exposed penis; and a prepubescent female with her face beside an exposed erect adult male penis with what appears to be ejaculate running down her face.  A picture of Webb's child was obtained for comparison with any images found on the computers.

7)      During the evening of May 27, 2010, and through the morning of May 28, 2010, Agent Erickson began obtaining a digital image copy of the computers and devices obtained from the files to confirm the presence of child pornography.  Agent Erickson was able to view random images and video files to confirm the presence of child pornography.  Additionally, Agent Erickson was able to identify several files that appeared to depict the live sexual abuse of prepubescent children that had been saved to a file labeled "Me" on Webb's external hard drive.  The videos were obtained by a webcam streamed live through a Yahoo chat application

8)      Also discovered during the previews was a JPEG image depicting what appeared to be Webb's nine year old daughter lying on a bed, under a blanket or a sheet. Beside her appears to be another female, of approximately the same age, lying on her stomach, dressed only in a t-shirt and panties.  This image was located in a file containing numerous other images depicting child pornography.

9)      Webb was chatting live with numerous other individuals using Yahoo. Some of Webb's "friends" include males from Great Bend and Pierceville, Kansas; Green Bay, Wisconsin; Washington; and Australia.  Discovery materials revealed 120 videos, including approximately 75 live webcam videos, containing child pornography.  The webcam videos depict images such as a six or seven year old girl performing oral sex on an adult male; and vaginal penetration of a female (approximately age eight) by an adult male.  The videos also depict digital penetration of females under the age of 12, by adult males.

10)     The live webcam videos depict a variety of adult males exposing themselves to Webb and/or masturbating on camera in the presence of a child.  Some of the webcam videos show adult males exposing and or sexually abusing children for Webb.  These webcams depict a daughter being sexually molested by her father.  The molestation included oral sex and vaginal sex.  There are videos of children being fondled by adult men.

11)     The investigation revealed the identities of several men who were sexually abusing their children, live, via webcam.  Several of the men have been prosecuted for these offenses. During the webcam chats, Webb also used the username "trish16nd2," where he acted as a young girl who was interested in both father and son.  One of the people with whom Webb had extensive webcam and chats was an adult male who was sexually abusing his 11-year old son, live, at the encouragement of Webb (who was posing as Trish).

See Docket No. 39, pp. 4-6.

The PSR established a total adjusted offense level of 32 and a criminal history category of I, with an advisory Sentencing Guideline range of 121-151 months.  See Docket No. 39, p. 8.  A conviction on a charge of receipt of materials involving the sexual exploitation of minors carries a five-year mandatory minimum sentence.

On May 20, 2011, a sentencing hearing was held in Bismarck, North Dakota.  Pursuant to U.S.S.G. § 5K1.1, the Government moved for a downward departure from the advisory Sentencing Guideline range of 121-151 months based upon the defendant's substantial assistance and cooperation in the investigation and prosecution of other individual(s) who participated in the offense.  The Government did not move for a downward departure pursuant to 18 U.S.C. § 3553(e) which would allow for a sentence to be imposed below a statutory minimum.   At the sentencing hearing, the Government recommended a downward departure of one-third (1/3) off from the low end of the advisory Sentencing Guideline range or a sentence of eighty-one (81) months.  The defendant requested a probationary sentence based on (1) his lack of any criminal history, (2) his level of cooperation and assistance, and (3) the finding he posed a "relatively low" level of risk to re-offend as determined in a psychological evaluation conducted by Dr. Ed Kehrwald on March 12, 2011.  See Docket No. 38 (sealed).[1]

---

[1] The Court gives little weight to the finding that Webb poses a low level of risk to re-offend.  Dr. Kehrwald's evaluation reveals that Webb admitted to "downloading sexual material and participating in email or chat rooms."  However, there is no indication that Webb ever disclosed to Dr. Kehrwald that he was actually an active participant in and an eyewitness to the production of live video webcams involving the sexual molestation of numerous young children.  Webb was not only an eyewitness, but was also directly involved in communicating with the pedophile/perpetrator during the course of the sexual assaults depicted on the live videos.

## II.    LEGAL DISCUSSION

### A.    CHILD PORNOGRAPHY

The harm to children depicted in child pornography was first recognized decades ago in New York v. Ferber, 458 U.S. 747 (1982).  In Ferber, the United States Supreme Court noted that, in the judgment of state and federal legislators and authors of relevant literature,

> "the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child."  Ferber, 458 U.S. at 758 (citations omitted).  Specifically, "sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions and have a tendency to become sexual abusers as adults.  Sexual molestation by adults is often involved in the production of child sexual performances.  When such performances are recorded and distributed, the child's privacy interests are also invaded."  Ferber, Id. at 758 n.9 (citations omitted).

The Supreme Court in Ferber also observed that the "materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation."  Id. at 759 (citation omitted).

> "[P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution.  Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.  A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.' . . . '[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions."

Id. at 759 n.10 (citations omitted); see also Osborne v. Ohio, 495 U.S. 103, 109-10 (1990) (re-affirming Ferber in a case involving possession of child pornography).  Twenty years later, the Supreme Court again acknowledged the harm to victims depicted in child pornography and observed that a new harm is caused each time the images are shared with someone different. Ashcroft v. Free Speech Coal., 535 U.S. 234, 249 (2002) (noting that "as a permanent record of a child's abuse, the continued circulation itself would harm the child who had participated.  Like a defamatory

5

statement, each new publication of the speech would cause new injury to the child's reputation and emotional well-being").

The cases in which courts of appeals have considered the Sentencing Guidelines in child pornography cases are also instructive in assessing the harm to victims.  The Fifth Circuit in United States v. Norris, 159 F.3d 926, 929-30 (5th Cir. 1998), is among the most comprehensive.  Rejecting defendant's arguments that "simply receiving child pornography is a victimless crime," and "the children depicted in the child pornography can only be victims of the crime of receiving child pornography in an indirect or secondary sense," the court in Norris noted that the "'victimization' of the children involved does not end when the pornographer's camera is put away."  Norris, 159 F.3d at 929.  The consumer, or end recipient, of pornographic materials causes the children depicted in those materials to suffer as a result of his actions in at least three ways:

> First, the simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials.  "[T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation."  The consumer who "merely" or "passively" receives or possesses child pornography directly contributes to this continuing victimization.

> Second, the mere existence of child pornography represents an invasion of the privacy of the child depicted.  Both the Supreme Court and Congress have explicitly acknowledged that the child victims of child pornography are directly harmed by this despicable intrusion on the lives of the young and the innocent.  The recipient of child pornography obviously perpetuates the existence of the images received, and therefore the recipient may be considered to be invading the privacy of the children depicted, directly victimizing these children.

> Third, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials. . . .  [T]here is no sense in distinguishing, as Norris has done, between the producers and the consumers of child pornography.  Neither could exist without the other.  The consumers of child pornography therefore victimize the children depicted in child pornography by enabling and supporting the continued production

of child pornography, which entails continuous direct abuse and victimization of child subjects.

Id. at 929-930 (internal citations omitted) (emphasis in original).

In addition to case law, the legislative history of the statutes in Chapter 110 acknowledges the harm to victims caused by possessors, receivers and/or distributors of child pornography, and confirms that Congress understood the primary victim of child exploitation crimes is the child depicted in the pornography.  Recently, Congress found that:

> . . . The illegal production, transportation, distribution, receipt, advertising and possession of child pornography, as defined in section 2256(8) of title 18, United States Code . . . is harmful to the physiological, emotional, and mental health of the children depicted in child pornography and has a substantial and detrimental effect on society as a whole . . . Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse.

Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(1)(A), (2)(D), 120 Stat. 587, 623-24 (2006); see also, Effective Child Pornography Prosecution Act, Pub. L. No. 110-358, § 102(3), 122 Stat. 4001 (2008) ("Child pornography is a permanent record of a child's abuse and the distribution of child pornography images revictimizes the child each time the image is viewed.").

In 1996, Congress observed,  "[W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years."  Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, Div. A, tit. I, § 121, subsec. 1(2), 110 Stat. 3009-26 (2006).

For more than thirty years Congress has focused attention on the scope of child pornography offenses and the severity of penalties for offenders.  By creating new offenses, enacting new

mandatory minimums, increasing statutory maximums, and providing directives to the United States Sentencing Commission, Congress has expressed its will regarding appropriate penalties for child pornography offenders.

**B.**      **CONDUCT OF THE DEFENDANT**

The crime committed by the defendant, Christian Webb, is serious and despicable. Nelson Mandela once said that "there can be no keener revelation of a society's soul than the way in which it treats its children." When one considers the current statistics surrounding crimes involving child pornography, and becomes familiar with the background of the criminal conduct that occurred in this case, one can only conclude that we are living in a country that is losing its soul.

This is not the routine or typical case involving a defendant convicted of receipt or possession of materials involving the sexual exploitation of children, i.e., child pornography. The defendant did not simply receive or possess images of child pornography. He was a live spectator and an active participant in live, streaming video webcams which depicted the sexual molestation of young, innocent children.

The record reveals that Christian Webb regularly contacted pedophiles through a chat line on Yahoo. Webb used not only his Yahoo username "nd_biboy," but was also using the username "trish16nd2@yahoo.com." Webb used the two usernames – one in which he portrayed himself as a young bisexual male, and the other in which he portrayed himself as a young, promiscuous female – to manipulate others to sexually abuse children while Webb watched via the other subject's webcam. In other words, each of the adult participants was actively involved in the sexual abuse of young male and female children and were willing to allow each other to view the abuse using a

8

web camera.  At the time of his arrest, Webb had in his possession at least 75 webcam videos (and possibly up to 150 videos) which depicted the live, sexual abuse of children.

The Court has viewed the live streaming webcam videos found on Webb's computer which were seized by law enforcement officers from Homeland Security Investigations, formerly known as Immigration and Customs Enforcement or "ICE."  All of the videos were not viewed in their entirety because one can only handle so much of the horrors depicted in those disturbing images. The spectrum of criminal culpability associated with these types of crimes is wide-ranging.  Few would disagree that the sexual deviants who molest children, produce, and distribute such images deserve the harshest punishment.  Webb was not the person depicted in the live video webcams who physically committed the sexual assaults on the innocent children.  However, he unquestionably played an active role as a participant who not only viewed the live images as they were actually being produced, but also encouraged the victimization through his communications with the sexual perpetrators who were at the production end of the spectrum.  The live streaming video webcam images depict all forms of deviant sexual behavior, including oral and vaginal sex with prepubescent children.  In essence, Webb was a live spectator and active participant in the production of the vile and heinous images depicted in the video webcams contained in his library of filth.

The conduct of Webb as an active participant in the production of live video webcams is, without question, vile, heinous, disturbing, and reprehensible at best.  Webb may not be the worst of the worst, but his deviant behavior in participating and encouraging the production of live video webcams in which innocent children are being victimized by pedophiles ranks near the top.  The Court has seen a wide range of disturbing and deviant sexual behavior by pedophiles convicted of sexual crimes but this is a first.  The defendant was not a mere consumer of child pornography.  He

9

was a spectator and an active participant in the production of live, streaming video webcams of sexual molestation which are preserved as a permanent record of the violent sexual abuse perpetrated on innocent children. The lifelong harm and misery caused to these innocent children is unconscionable.

Pursuant to U.S.S.G. § 5K1.1, the Government has moved for a downward departure from the advisory Sentencing Guideline range of 121-151 months based upon the defendant's substantial assistance and cooperation in the investigation and prosecution of other individuals who participated in the sexual offenses depicted in the live video webcams. See Docket No. 41. The Court is fully aware of its authority and discretion to depart downward under Section 5K1.1. In the exercise of its authority and discretion, the Court will grant a slight downward departure of seven (7) months.

It is well-established that the sentencing judge has broad discretion to grant or deny a motion for a downward departure under Section 5K1.1. See United States v. Morris, 139 F.3d 582, 584 (8th Cir. 1998) (finding that decision to deny the government's 5K1.1 motion is not reviewable because the district court did not consider any illegal facts and clearly acknowledged its discretion to grant or deny the motion). The undersigned had given serious consideration to deny any downward departure in this case and a refusal to depart from the Sentencing Guidelines under Section 5K1.1 is also non-reviewable. United States v. Dobynes, 905 F.2d 1192, 1197 (8th Cir. 1990). The Court is not convinced that the assistance and cooperation provided were substantial. The other pedophiles who were sexually molesting children on the live video webcams were persons whose identities and locations were obtainable from the IP addresses obtained as a result of the search and seizure of the defendant's computers. The Court is not obligated to explicitly state its reasons for granting or denying a motion for downward departure. Suffice it to say that the Court has carefully and

independently considered each of the Section 5K1.1(a) criteria.  In the exercise of its discretion, the Court **GRANTS** the motion for a downward departure but declines to adopt the Government's recommendation of a one-third (1/3) downward departure from the low end of the advisory Sentencing Guideline range of 121-151 months, or a sentence of 81 months.  A sentence of 81 months would be a travesty of justice.

The PSR established a total adjusted offense level of 32 and a criminal history category of I, with an advisory Sentencing Guideline Range of 121-151 months.  <u>See</u> Docket No. 39, p. 8.  A conviction on a charge of receipt of materials involving the sexual exploitation of minors carries a five-year mandatory minimum sentence.  The sentence within the advisory Sentencing Guideline range is sufficient but not greater than necessary under the circumstances.  The Court is firmly convinced that a sentence near the high end of the advisory Sentencing Guideline range is warranted.

The defendant is not one of the typical troubled souls the Court encounters who for some strange reason decide to explore the underbelly of cyberspace for images of child pornography. Instead, the defendant was a spectator and an active participant in the production of live, streaming video webcams during which the defendant communicated with, and encouraged, the perpetrator to sexually molest minor children.  <u>The defendant was an actual eyewitness to the live and ongoing sexual abuse and molestation of young children using webcams and he sat and watched as more than a mere interested spectator</u>.  From the Court's perspective, Webb essentially stands in similar shoes to the pedophile committing the crime – Webb was encouraging the sexual molestation of children as a spectator while communicating live with the perpetrator.  It does not get much worse than that.

The Court is also fully aware of its authority and discretion to impose a variance or a non-Guideline sentence after careful consideration of the sentencing factors enumerated in 18 U.S.C. §

11

3553(a).  As previously noted, the undisputed facts contained in the PSR address each of those sentencing factors.  Those facts have been adopted by the Court and incorporated by reference in this memorandum and in the judgment.  The Court would never choose to impose a sentence <u>below</u> the advisory Guideline range based on the facts presented in this case.  In light of the fact the Court has concluded that the Sentencing Guideline range of 121-151 months is "sufficient but not greater than necessary" under the circumstances, and in light of the fact the defendant cooperated with the Government and appears to have accepted responsibility for his misconduct, the Court reluctantly declines to impose a variance above the advisory Guideline range.

In the alternative, and in the event there is a challenge to the downward departure granted in this case, the Court would note in closing that it firmly believes an upward variance is warranted.  Careful consideration of each of the sentencing factors set forth in 18 U.S.C. § 3553(a) leads the Court to believe that an upward variance approaching the twenty-year statutory maximum sentence is likely a far more appropriate sentence.  The Court gave serious consideration to an upward variance in the range of 18-20 years (the statutory maximum) with the possibility of some deference being afforded to the Government's recommendation for a downward departure under Section 5K1.1, albeit a minimal departure, if any.

As a practical matter, the defendant could have been, and probably should have been, prosecuted for the production of sexually explicit materials under 18 U.S.C. § 2251.  The conduct of the defendant equates with aiding and abetting the sexual exploitation of children which carries a 15-year mandatory minimum sentence.  The advisory Sentencing Guideline range for a conviction under 18 U.S.C. § 2251 is set forth in U.S.S.G. § 2G2.1.  Section 2G2.1 carries a base offense level of 32.  There is a 4-level increase for images which depict children who had not attained the age of

twelve years; a 4-level increase if the offense involved the commission of a sexual act; a 2-level increase for distribution; a 4-level increase for materials which depict violent conduct, i.e., sexual intercourse; a 2-level increase if there is a parent or legal guardian of the child involved in the offense or if the minor was in the custody, care, or supervisory control of a co-defendant; and a 2-level increase for use of a computer.  See U.S.S.G. § 2G2.1(b)(1-6).  A conservative calculation of the advisory Sentencing Guideline range results in an adjusted offense level of 50.  Regardless of the criminal history category, the advisory Sentencing Guideline range for any offense level of 43 or higher is a life sentence.  A life sentence is the harshest of penalties but it is a sentence that is probably more appropriate, warranted, and "sufficient but not greater than necessary" based upon the undisputed facts and circumstances presented to the Court in this troublesome case.

The statutory maximum sentence for the offense to which Webb pled guilty is twenty (20) years.  This case falls outside the heartland of cases contemplated for a conviction of receipt of materials involving the sexual exploitation of minors.  The evil that occurred in this case is unimaginable.  Christian Webb is far from a sympathetic defendant.  The fact that there are men like Webb who work in positions of trust and authority, who are educators in our public school systems, and who prey on vulnerable children, is horrifying and despicable.  A lifetime in federal prison for such persons is probably not long enough.

III.   **CONCLUSION**

Based upon the undisputed facts set forth in the PSR, and the factual findings made by the Court as set forth in this Sentencing Memorandum, which facts are supported by a preponderance of the evidence, the Court finds the following advisory Sentencing Guideline range applies:

| | | |
|---|---|---|
| **Base Offense Level:** | **22** | **(U.S.S.G. § 2G2.2(a)(2))** |
| **Specific Offense Characteristics:** | **+13** | **(U.S.S.G. § 2G2.2(b))** |
| **Acceptance of Responsibility:** | **-3** | **(U.S.S.G. § 3E1.1)** |
| **Total Adjusted Offense Level:** | **32** | |
| **Criminal History Category:** | **I** | **(U.S.S.G. § 4A1.1)** |
| **Advisory Guideline Range:** | **121-151 months imprisonment** | |
| **Downward Departure:** | **7 months (U.S.S.G. § 5K1.1)** | |

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Christian Webb, shall be committed to the custody of the Bureau of Prisons to be imprisoned for a period of 144 months (12 years) followed by a lifetime of supervised release and registration as a sex offender.  The Court concludes that the sentence is sufficient but not greater than necessary to serve the ends of justice.

**IT IS SO ORDERED.**

Dated this 20th day of May, 2011.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court

14